Thank you. And I call case number 19-1591, SolarWorld Americas v. United States. Now, I think we should all begin by begging each other's indulgence, because this is a very confusing case in terms of the parties are and what they're arguing, and we've got a cross-appellant here and so forth. So it would help me, at least, if each counsel could start off with five seconds of discussing what your position is before the court this morning. Mr. Fried. Good morning, Chief Judge and Your Honors. John Fried on behalf of Trina Solar. Trina Solar is challenging two commerce determinations with respect to surrogate values, and we are replying to SolarWorld's claim with regard to commerce's valuation of Trina's fact sheet. Okay. Please proceed. May it please the Court. Again, good morning, Chief Judge and Your Honors. John Fried of Trade Pacific, PLC, on behalf of Trina Solar. First, with regard to commerce's valuation of Trina's nitrogen factor of production using Thai import data. Despite abundant evidence, the Thai import data was aberrant and unreliable. The first issue with respect to the valuation of nitrogen, commerce valued Trina's nitrogen consumption based on a small quantity of imports into Thailand for which the Thai data expressed an average price of $11.68 a kilogram. Commerce ignored all of the evidence submitted by Trina that established the unreliability of the Thai import data, including all other potential surrogate value information, which represented over 99% of the record information with respect to nitrogen prices. Well, could I interrupt you here, Mr. Fried? I get your argument. I mean, I get the case you make about the quantities versus the amount, and it may have some sympathy at some level. But my concern is we've got a deferential standard of review, and the standard seems to be whether the import data is aberrant just because the import quality is low. And how would you say that we have to assess that? What are the rules of the game with regard to this? Commerce, we agree that small quantities are not inherently unreliable. But in this case, we've demonstrated that these small quantities are. When commerce is faced, well, first we'll start with commerce's default kind of source for valuing materials in these non-market economy anti-dumping cases is to use import data. And when those import data have some problem, commerce, or there's an allegation of some unreliability or aberration, commerce's default test is to look at other countries that are similarly economically comparable to China and look at the import value into those countries and see if the Thai import value for nitrogen falls within the range of the countries. Here, commerce did that. They said, okay, the Thai is $11, but we have... Counsel, wait, you have a question. You have a question. Going back to Judge Pro's question, you're saying that small quantity alone doesn't necessarily make it aberrational. So what did you present as evidence to show it was aberrational other than the fact of the small quantity? We submitted three sets of information. We submitted domestic Thai invoices and price quotes from Thai producers of industrial nitrogen. That set of data totaled over 700,000 kilograms, showing the price between $0.07 and $0.15. That was non-public data, right? Well, the information was not presented as confidential information, but it was not from a published public source. It was an actual invoice between domestic Thai parties. Okay, we'll put that one aside. What are the other two? The other two are the U.S. exports to Thailand. So Thailand reported its imports of nitrogen from the world. Trina provided U.S. data that shows what were U.S. exports to Thailand of nitrogen during the same period, and we provided a table at page 18 of our reply brief showing that these data are irreconcilable. We presented the U.S. export data to Thailand of nitrogen to show not that the U.S. exports are another benchmark that commerce should consider, but to show that Thailand's reporting that they only imported $95,000 of nitrogen during this period. But the U.S. reported that it exported $95,000 of nitrogen at nearly almost 600,000 kilograms. But for some reason, the Thai data only shows 4,000 kilograms of imports at $300,000 of value. What did commerce say about this? They said that they don't use export data as a benchmark. Well, our point is commerce has to consider the record as a whole. They were presented with evidence, the Thai import data saying this represents Thai imports of nitrogen during this period, the U.S. exports to Thailand that just did not reconcile to what Thailand said they were importing from the U.S. We had two data sets purporting to express the identical trade, and even putting aside you might expect some small differences, the differences here are so stark that you couldn't reasonably conclude that both data sets were correct. I don't understand how it can be the same trade because in your own chart, the U.S. data is for a quantity of 586,000, whereas the GTA data is for only 4,000, so the pricing can't be for the same quantities. Exactly. Something is wrong with one of those sets of data because... Well, the problem is if something is wrong, even accepting your proposition, it doesn't tell us which one of these is correct. Well, and for that I would say that the U.S. price is 16 cents per kilogram. That corresponds very closely with all of the evidence on the record on what industrial nitrogen is valued at, putting aside the small quantity of imports into these other countries. Again, 99% of the information on the record, if we look at by quantity, 99% of the information on the record shows that the price is fairly low. It's somewhere in this 7 cents to 15, 16 cents per kilogram, and the Thai data is showing this aberrationally high number for which the only corroborating evidence is this, and so Congress used this bookend method to determine that the Thai data was reliable. Now, you had, in response to Judge O'Malley, I think you said you had three points. Was that number two? Do you have a third point? That was number two, and so number three is the import data into the other countries that Congress considers economically comparable to China in this case. We provided a chart on page 12 of our reply brief that summarized all of the sources of information for valuing nitrogen, and so the import data into Bulgaria and Romania show large quantities of imports. Where there are large quantities of imports, the price into Bulgaria was 9 cents a kilogram. The price into Romania was 13 cents a kilogram. And together, those imports accounted for basically 99% of all the imports of all six countries, so the GTA data itself from all six countries corroborates those domestic prices that we were providing in Thailand, and Congress, they just say that's not how we look at it. We don't look at everything and try to figure out among these six countries what's the average price. They just say we just have this bookend method. We say there's six countries. What is the range of prices? If it falls within the range, we say it's reasonable, and we put in our writing. I appreciate that, but before your time runs out, is your second major issue about this zeroing? Before we go on to the zeroing, could I ask one other question about your second source of data? Where does what you list as the US ITC data web, what is that? Where did that information come from? That's US census data that the US International Trade Commission makes available. How is it collected? It's downloaded through the US ITC data web website, and it's collected by HTF number. Collected by customs or what? Yes, technically, I think it's US census data. What is census data? It's the record of US export of goods. It tracks both exports and imports of goods by HTF number, by ports of entry, and by trading partner or country of import or country to export. Collected by customs. Correct. Okay. That's why I say we're talking about the same trade, because we're not using a search term for nitrogen or something. We're using the HTF number, and the HTF number is harmonized at this level of trade. Going on to the zeroing, Commerce says it doesn't make any difference. Why aren't they right about that? Well, they do say that it doesn't make any difference, but I would say it's still incorrect. At the agency level and at the court below, part of the argument was about, well, rounding explains this. Our argument is that even if we say instances where the quantity and the import data are zero, even if that is explained by rounding, it's still correct to exclude the value. Does it make a difference? It does make a difference, because every time you exclude a quantity from the denominator and you're including a value in the numerator, you're always putting your thumb on the scale of increasing the price. But that's theoretical. As a practical matter, does it make a difference in the anti-dumping duty rate? It does. Did you make it? Where in the record did you establish that it makes a difference? In terms of the impact, I don't know. I can't give you the exact impact here. And we didn't make that argument to the agency, because we don't typically-the Commerce Department doesn't really kind of confront issues that way to say, okay, well, by doing this, our margin was 6%, the way with your method. If you change the method to exclude the zeros, the anti-dumping rate may drop to 5%. So we didn't present the information that way, and those are just hypothetical. If I'm not incorrect, I think the government's brief at pages 22 and 23 does have some data, and I want to know if you disagree with that. That's where they say the total value of import quantities represents only .005% of the total value of all data points. Are you familiar with the argument they're making? And I just wondered if you had any-that was their-they gave data as to why this is, to Judge Dykes' point, has no real relevance. What's your response to what they came up with? I guess our point is it's incorrect. If we're saying, yes, it moves the needle by a small amount, I would agree, and that in a lot of the trade cases before commerce and the Court of National Trade and this court, it may not be-the value of trade may not be significant enough to litigate an issue that might have a tenth of a percent or a hundredth of a percent of difference in the result. But here, if it's incorrect, does it matter whether it's a feather on the scale, a thumb on the scale, that systematically increasing surrogate values when there is-when it's mathematically incorrect to include the value in the numerator when the quantity or the denominator is zero? If we're thinking about a weighted average- Article III courts are allergic to deciding hypothetical cases, and the government's basically saying this is a hypothetical case. It's not a real-world case in this respect. I would say, in this case, this approach systematically increased the surrogate values applied to Trenas imports or to Trenas factors of production. And, yes, the impact on a percent basis is small, but it's still incorrect. Well, the other problem I have is I understand your alternative proposal to also not be entirely correct and to sometime lead to a degree of undervaluation. So in a situation where any choice is arguably imperfect, and the government has demonstrated that its imperfect choice of two imperfect choices doesn't matter anyway. What's wrong with that? I would say what's wrong with that is that when we-if we round a number to zero, if we're calculating a weighted average, what should the weight of the value associated with that quantity be given? If it were one, it would be given a weight of one. If it were two, when we're calculating the weighted average, it would be given a weight of two. In this case, it was rounded to zero. That value should be given a weight of zero. It shouldn't factor into this weighted average calculation. If you were taking-if I can finish that thought. Is there any other questions? I guess- Well, you can finish one-give us one sentence, but then we're going to move on and reserve your rebuttal time. You have one more sentence to conclude the thought. Our argument is really that this is just mathematically incorrect, regardless of the impact. All right. Thank you. Thank you. Mr. Brightville? Yes, Your Honor. Good morning, and may it please the Court. Tim Brightville on behalf of Solar World Americas. We have two affirmative issues. I'll spend most of my time on tempered glass, and the second affirmative issue is with respect to backsheet valuation. And these are designated as cross-this is designated as a cross-appeal, right? That's correct, Your Honor. Okay, thank you. Commerce has made two incorrect and unreasonable decisions with respect to factors of production in this case. Both are unsupported by substantial evidence and, in fact, are contradicted by compelling record evidence. The first is on tempered glass. In this situation, the Court of International Trade committed error in twice remanding commerce's selection of a surrogate value for Respondent Ingley's tempered glass inputs based on Thai import data. And this forced commerce under protest to instead value the glass using Bulgarian data. Commerce fully analyzed this issue in its final results in the review and further in its first remand results, and both times it appropriately determined that the Thai surrogate value for tempered glass was not aberrational based on substantial record evidence and consistent with its past practice. So we have three main points. Counsel, isn't the question really not whether the first use of the Thai data would have been acceptable, but whether the ultimate data selected is aberrational? So, in other words, we're not supposed to decide whether there shouldn't have been a remand in the first instance if the ultimate conclusion reached falls within a category of not being aberrational. Well, Your Honor, given what commerce did under protest, we think it's both correct that what commerce ultimately did when directed to by the court was not reasonable, and we'll go into why, and why its first choice was reasonable and consistent with its practice. So, first, commerce's finding that the Thai average unit value was not aberrational was consistent with its practice. And second, when determining whether an average unit value is aberrational, commerce considers the overall average unit value. It does not pick and choose values for individual imports within a surrogate country's import AUV. And that's what the court had asked commerce to do, which was incorrect. And third, even if commerce were to disregard its practice of evaluating these unit values in the aggregate, the individual prices imported from Hong Kong into Thailand were not aberrational. With respect to the question of what commerce's practice was, I thought that the court specifically found that commerce didn't establish that it had a current practice of determining aberrationality based on overall import value. Well, Your Honor, commerce does have an established practice. And as was discussed earlier with respect to a different surrogate value, just because a price is higher than others does not make it aberrational. So what commerce does is two things. First, it looks at import values for the same harmonized tariff schedule number from the other potential surrogate countries in a given case. And second, it looks at the data from the same tariff schedule number for the same surrogate country, in this case Thailand, over multiple years. And commerce followed that practice in the underlying review. It selected the value from Thailand, which was the primary surrogate country in the review. And commerce has a strong interest in gathering all the values from the same surrogate country. It then looked at the average unit value of $4.14 and the import quantity, which was more than 2 million kilograms, and found that that fell within the range of data from all of the countries on the surrogate country list. In fact, the Thai average unit value of $4.14 was not even the highest of the four countries on the surrogate country list for which data was available. Where do we find that commerce has addressed this point that led to the first remand about the inclusion of the Hong Kong data, which, if I recall, the Court of International Trade said was the problem with the calculation? Sure. So, Your Honor, the point I was just discussing, where they looked at all the countries, you see that in the decision memo, which is at Appendix 720. Now, with regard to the Hong Kong data, commerce clearly explained that its practice is to consider the overall average unit value and not pick it apart and not look at whether or not the Hong Kong value was aberrational for some reason or any other countries was. Where did it say that? Sure. So, they explained-they cited their practice in the wood flooring case, and it's discussed-cited at Appendix 761 is the wood flooring issue and decision memo. I'm not looking for the wood flooring decision. I'm looking for the decision memo here, which addresses this particular point and explains why what they did was correct. After the remand, you say they made the change under protest. Did they explain in that decision memo why what the CIT required was wrong? Your Honor, they explained-when they analyzed the Hong Kong data, they explained at the decision memo-their decision memo at Appendix 721 that the imports from Hong Kong into Thailand were more than 38,000 kilograms, which means it was one of the largest sources. And at the same page, Appendix 721, they explained that the prices of tempered glass inputs from Hong Kong into Thailand were relatively high but not aberrationally high, and in fact that the imports from the Netherlands and the United States entered Thailand at even higher prices than the Hong Kong imports. So they addressed both of the reasons why the Hong Kong data was not aberrational and why they didn't pick it out of all the other countries that fed into the Thai import value. And fundamentally, Commerce has substantial discretion in selecting the best available information to serve as a surrogate value. This Court has ruled that, of course, in the downhole pipe case and in the QVD food cases that we cite in our brief, and there are good reasons for that discretion. Doesn't that substantial discretion also apply to the ultimate determination? In other words, we have to give them discretion to choose the Bulgarian import data as well, right? Well, again, I think there is less reason to give discretion when they twice tried to rule in terms of using Thailand, which was the primary surrogate country, and because you don't have perfect data from any country, Commerce has this regular practice of using one primary surrogate country for the review, and that's what they did here. My recollection is that we have cases that addressed the issue that Judge O'Malley is talking about, and if my recollection is correct about that, unless Commerce agrees that it made an error the first time around, that you can challenge the Court of International Trade's remand decision. Is my recollection about that correct or not? Are you familiar with those cases? Your Honor, I think you're correct. I don't have those right here in front of me, but I think certainly the fact that Commerce made its ruling under protest means that what the lower court did should be very closely scrutinized here. Turning very briefly to the second argument that we had with respect to backsheet, here we believe that the court erroneously upheld Commerce's selection of a surrogate value for backsheet inputs. What Commerce used were two harmonized tariff schedules numbers that represent a very broad oversimplification of a highly technical engineered set of goods that go into backsheet. Commerce simply chose the categories based on the primary material in each respondent's backsheet, but it ignored the critical context here and the fact that solar panels are manufactured and certified to survive in operating conditions when they're exposed to the elements. Yes, but you had no HTS category for these particular backsheets, right? Well, there's none that is specific to backsheet, but we did recommend an alternative, which was an other plastic category, which would have more accurately captured that there are multiple plastics going into the backsheet. That category is very highly general and, right, I mean, that's a very general category. Other plastics in cheap form, is that the one you propose? That's right, Your Honor. It is more general, but because of the fact that several plastics went into this, it would have been more accurate to use that general category than just a category for the one material in each of the backsheets. With that, unless there are other questions, I'll hold for rebuttal. Thank you. Thank you. Ms. Ogin, you're up next. Good morning, Your Honors. May it please the Court. The United States is here to defend the trial court's judgment with respect to the issues of the surrogate value selection for nitrogen, the use of zero-quantity import data, and the surrogate value selection for backsheets. So, I will address those issues in the order in which they've been presented. We are not appealing... And let me just be clear. Yes, that's what my question was about the other... We are not defending this aspect of the court's judgment on appeal either. So, with respect to the backsheets, you have now adopted, as a result of the remand, a new approach, which you're defending. So, to Judge O'Malley's point, with respect to the backsheets, we should look to your current decision to see whether there was an abuse of discretion. Is that correct? No, Your Honor. The backseat issue was decided...was sustained by the CIT in the first instance. It was not remanded. The only issue that we are defending that was remanded was the issue of the zero-quantity data use. And in that circumstance, Commerce simply provided additional explanation for why it did what it did. It did not change its position on remand. So, there was no remand on the backsheet? Correct. Okay. So, starting with the issue of the surrogate value selection for nitrogen, we believe that substantial evidence supports Commerce's selection. Trina does not dispute that the TIE data that was selected otherwise met the regulatory criteria for selection of the surrogate value. That is, it was publicly available, it represented a broad market average, and was specific to the input in question. In essence, Trina asks this court or asks the trial court to substitute its own methodology for that selected by Commerce, and that is not the role of the reviewing court. I think it's also important to recognize that what Commerce is trying to achieve here is not to corroborate Trina's purchase price or to construct a global average. It's trying to ascertain what the surrogate cost is in the surrogate country, that is, Thailand. And so, Commerce did follow its practice for evaluating whether TIE import data was aberrational. It looked at where the TIE import data fell within the range of all the other economically comparable countries. What about the table that they have on page 18 of the reply brief with respect to the TIE data, which they say calls into question the accuracy of the TIE data itself, because they say that it can't be consistent? And I don't see that Commerce really addressed this inconsistency in its decision. So, this is the U.S. international trade export data. And I think what we would say about this, what the trial court said is that trying to compare or use export data to call into question import data is comparing apples to oranges. We can't assume that the data is being collected in the same way or being accounted for in the same way. And so, on page 58 of the appendix, this is the trial court's, I'm sorry, page 59. The trial court explained that the reported U.S. export value does not demonstrate that the choice to use TIE import data is unsupported by substantial evidence. I think one other important point about this is that what... Yeah, but the problem that I'm asking about is I don't see that Commerce ever told us why these two sets of data are reconcilable. The argument was that they're irreconcilable, and I don't see where Commerce has told us why we shouldn't be concerned about that. I think probably the closest part is on page 745 of the appendix in the decision memorandum. Commerce explains that its preference is to use non-export data. And so, using export data to call into question import data, as the trial court explained, it's reasonably discernible that Commerce would not consider export data to be a measure against which to assess the reliability of import data. But the problem is it doesn't say why. Well, I think why is because, again, we're trying to achieve comparisons that are apples to apples, right? So that's why it makes sense to compare GTA import data from Thailand against GTA import data from other economically comparable countries. It makes less sense to look at one particular data point, export data from the U.S., and to use that to compare one data point in the GTA import data that is imports from the United States into Thailand. And that also doesn't address whether the remainder of the data that comprises that total GTA import data from Thailand is unreliable because there's other imports from other countries. But Trina says that you use the same categories to calculate the export data and the import data. So why doesn't that indicate that it's not really apples to oranges? Well, again, we don't know how the data is collected, or we can't assume that the data is collected in the same way for GTA, which is a private service that Commerce has a lot of experience with compared to the ITC data web information, which is collected from customs reporting in the United States. So, again, even if it's the same HTS categories, we don't know how the data itself is collected. And so the more reasonable comparisons and the comparison that is the methodology that Commerce has is to compare import data to other import data when assessing whether a particular data can be used or is unreliable. This first line about US ITC data web, that is for Thai data, right? That is- my understanding of that is exports from the United States into Thailand. And these- the data here can't be- both sets of data can't be correct, right? I mean, probably not. Right. Yeah. But that doesn't necessarily require that Commerce not use the GTA import data, you know, even if those can't be reconciled. Again, I think that the way that they can't- the explanations for why they can't be reconciled, we don't necessarily have that on the record. But that doesn't mean that the GTA import data for Thailand is unreliable. It might be that the ITC data is unreliable. It might be that the reporting methodologies are entirely different. We just don't know. And in light of that, it was not unreasonable for Commerce to continue to use its own well-established practice and not to depart from its chosen methodology. Given the overall fact, based on its normal test, that the GTA import data that it did select and it did use fell within the bookend of import data from other economically comparable countries. With respect to the second issue on appeal, Commerce's use of import data with positive values but zero quantities, again, Commerce provided a reasonable explanation on remand for why this data was usable. I think just to answer the questions that the court had for Mr. Fried, as a practical matter, it is correct and Commerce did find that there's very little impact in Commerce's use of this data. To be more specific, on page 794 of the appendix, on remand, Commerce went through a number of tests and analyses of this data and concluded that if it were to take out the zero quantity data points, it would make almost no difference in the AUV. For example, there were 76 different HTF categories that Commerce used to calculate the factors of production in this case. For 70 out of the 76, taking out the zero quantity data points made no difference to the average unit value. For four of the 76 categories, there was a difference of 1%. For the remaining two categories, there was a difference of 2% and 5%. Overall, when you look at all of the 76 categories, there was an overall difference of 0.16%. It is a very small effect on the overall data. In light of that, the overarching goal that Commerce has to use a broad market average is accomplished by continuing to keep this data in the data set, in the calculations, because Commerce was satisfied that the data represented rounding down as opposed to error in reporting or otherwise, which might otherwise be a reason to remove this data from the data set. If it's mathematically incorrect and it does skew the numbers to any extent, why shouldn't we say, well, this is just not an appropriate methodology and it may not make a huge difference in this case, but it could make a huge difference in some other case and so Commerce shouldn't keep engaging in this kind of practice? We disagree that it's incorrect as a mathematical error. I think that would be our first response. I think the burden is to show that Commerce's methodology is unreasonable, not just that there might be another way or even possibly a better way. The burden is on Trina to show that this methodology is contrary to law and it hasn't. The overarching methodology is to keep the data sets as a whole and not to start cherry-picking out data, which is going to make the overall calculation less reliable and less accurate. Commerce went through this process to demonstrate that these instances of zero-quantity data aren't random error. They do represent real imports and so in light of the fact that it does represent real imports, it is reasonable for Commerce to continue to use this data in its calculations. What is the numerator and what's the denominator? I think the briefs are not very clear about how this computation is made. The numerator would be the sum of the quantities and the denominator would be the sum of the value. Let me make sure that I said that correctly. Right. I believe that's correct. Say it again. The numerator is what? The numerator is the quantity.  The numerator is the sum of the quantities. They were saying that the zero quantity was excluded. I'm sorry. You are correct, Your Honor. I had my fractions confused. The numerator is the aggregate prices for each transaction? I believe that's correct, Your Honor. And the denominator is the quantity? Correct. So, the effect of this is that you have a price for these zero transactions in the numerator and no quantity in the denominator. Right, although what you're looking at is, of course, the overall instances of imports in a particular HTS category. So, for most of these HTS categories, you have more than one import, right? You have a number of imports. The sum of the however many imports in that particular category is being aggregated. Anything else? No. I'll move to backsheets, which I think we can just address very briefly. As SolarWorld admits, there wasn't a surrogate value available on the record that was specific to the respondent's backsheet. And in light of that, it was reasonable for Commerce to select the HTS category covering the type of plastic that most closely corresponds to the respondent's backsheets. And Commerce did consider the HTS category that SolarWorld proposed on page 728 of the appendix, which that category covered plastics not elsewhere specified. But Commerce concluded that that, in fact, would be less specific because it wouldn't encompass plastics that were the PET and the EVA that the respondents actually used. In the absence of anything more specific, Commerce's selection was reasonable and Commerce is not required to, again, construct something different. It has to use the information that's available on the record. It did so. The fact that the selection might be imperfect, as this court has said in How Meridian, does not render the selection unreasonable. Okay. Thank you. Mr. Ellis, are you with us? Yes, I am, Your Honor. Good morning. Can you all hear me, I hope? Yes. Okay. Thank you. For the record, my name is Neal Ellis from Sidley Austin on behalf of the Ying Lee Companies. And to be clear, we are just FOEs or cross-FOEs, I suppose, regarding two issues that were raised by SolarWorld in this case, the tempered glass evaluation and backsheet evaluation. And I'd like to focus primarily on the tempered glass issue, since the United States is not defending that. I'm the only party on the other side of that issue who will be talking today about that issue, I believe. And I want to start with addressing one of the questions that I think Judge O'Malley's – then the rest of you also joined in in addressing counsel for appellant, which is what is the standard of review here, which is obviously an important issue. And I have to apologize. I think the briefs were not quite right on that issue. As Judge Post said, the substantial evidence test only goes to the final decision by the agency. That is, was the adoption by the agency of Bulgarian surrogate value in this case supported by substantial evidence. The prior decisions by the Court of International Trade remanding, this court has noted in the clearest explication of it is in the ALTEX, ALTX, Inc. case versus United States, 370S3-1108, where you explained that where there are remands that are not kind of compelling in outcome or saying that the determination by the agency was unsupported by substantial evidence, but is simply seeking clarification or further explanation. In that instance, this court applies an abuse of discretion standard. And I submit that that is, in fact, the situation we have here. Judge Kelly of the trade court was very clear on both of her remands that she wasn't finding anything or concluding anything. She simply noted that there was some ambivalence or internal contradictions within the department's determinations, both the initial final determination and the first remand determination that required further explanation so that she could have an understanding of what the department's practice or policy really is in this case. And so under an abuse of discretion standard... I thought the result of this was telling Commerce that it had a problem with including the Hong Kong imports or exports into Thailand. No, Your Honor, with all due respect. She never said that you can't do this. Where do we find Commerce's remand decision about the tempered glass? The remand decision by Commerce... It is in the J.A. page 770... It starts at 773. And in the first remand, which is what I think you're referring to, the department goes down the link and explains that it doesn't have a policy. Well, first, it confessed error, in effect, in its initial determination, which in effect suggests that the Court of International Trade was right to remand it the first time because the agency said, we don't consider individual values that go into the surrogate country's overall aggregate value. But it cited some decisions where that's exactly what the department did in the past. So the department said, whoops, those are no longer good law. What we do now is under wooden flooring. But as the Court noted, that was in the first remand. But what the Court of International Trade noted was, in fact, in wooden flooring, the department did exactly that once again. So where do we find the final decision after the second remand, which addresses this issue? Unfortunately, there's just a couple pages of that. The department's final second remand decision is in Appendix 6502. In 6516, there's just two pages. And there it says, we have determined under protest to value English tempered glass using Bulgarian AUVs rather than Thai. So the department stopped trying to articulate its standard and said, instead said simply, we're going to go to Bulgaria and avoid this whole problem. And nobody had challenged the validity of the Bulgarian data. That is, there was no suggestion that it was not supported by substantial evidence, which implies that... But this would have done it differently but for the remand, right? Sure, that's right. There's a but for there, but it's not being compelled by the court. The court was very careful to make clear. It was not compelling. It just wanted an explanation. The problem is that I think, Your Honor, this case may just be an outlier on this issue. Because if you look even at the cases cited in the reply brief by Solar World to this court, it cites some more recent cases, laminated sacks. And in both of those cases, the department did the same thing. It said, look, our general practice is to look at a single aggregate surrogate value and we recognize that. But the department never foreclosed itself from considering individual unit values that would be aberrational. And in fact, in laminated sacks, it specifically looked at those. It rejected the argument that they were aberrational, but it considered the issue. Our case is the only one, I think, where the department said, we don't have to consider this issue. We just look at aggregate data, period, and gave some reasons why they didn't have to. So, you know, we submit that the court below was right under the abuse of discretion standard, asked for further clarification. And then the department was right ultimately. It was supported by substantial evidence when it adopted the Bulgarian alternative surrogate value. I'd like, unless there are more questions on the glass issue, I do want to just touch on Bakshi. Just two points. One is that the alternative, the, oh, sorry, I will stop there. Everything is outdressed on my briefs. Thank you. Thank you very much, Your Honor. Thank you. Thank you. Mr. Freed, we're back to you for rebuttal. Thank you, Your Honor. I will speak briefly on Bakshi. With respect to Trina. Well, wait a minute. I'm sorry. You're, Mr. Freed, I thought you were doing response to what was your initial appeal. It's a bit confusing because I am both responding to SolarWorld's arguments with regard to the Bakshi surrogate value, and I'm also rebutting the responses to our arguments on nitrogen and the zero quantity of the imports. Well, can you tell me how much of your five minutes left you're dividing to those just so I can keep track? I'll try to keep the Bakshi comment just to one minute. All right. Okay. Which I think gives the, okay, go ahead. Okay. Thank you, Your Honor. First, SolarWorld, they cite to Trina's market purchases to say that the market purchases, those being those imported into China from market economy countries, the price Trina paid was much higher for its Bakshis than the surrogates applied to it. First, the import confirmed that the HTS category 392062 is like the correct classification for Bakshis. Two, SolarWorld overlooked that those imports represented only 0.3% of the total quantity of the quantity of Bakshis purchased by Trina during the period. So you can't, by commerce regulation, they don't impute those purchases as representative of all of Trina's purchases or consumption of Bakshis. So commerce has followed its practice. There's no reason to for its decision was reasonable. One point that SolarWorld makes is they say that we're not presenting Trina's market purchases as a substitute. We're saying it's probative evidence that has to be considered and has to inform the decision. This is kind of a transition to my point, which is in the same arguments were made with regard to the nitrogen information that Trina submitted, where Trina submitted the domestic prices for nitrogen within Thailand. And those were dismissed because they're not commerce's preferred source for surrogate values because they aren't as publicly available or broad market as other sources of data. But we cite in our brief at footnote 30 fish fillet case where commerce, they do use price quotes and invoices as surrogate values. So they can't just be dismissed. That's the first set of facts that were dismissed by the agency in the lower court. The second point, the US ITC data web data versus the GTA data, if we don't know which one is correct, then what do we do? We could look to the record and see which ones are more in line with other record data. And the US price is in line with 99% of the record data. And so commerce should have resolved that question. Instead, they said, we don't like to use exports for surrogate values. Well, we weren't suggesting to use the US export price as a surrogate value. We're saying this is a probative fact that you have to grapple with and it should inform your decision. And the last point I want to make is that both the agency and the court just rested on this notion that commerce has a single test to determine whether a surrogate value is aberrational, this bookend method. And while that may be a reasonable method in all cases, or in many cases, as applied here, it isn't. Because the corroborating end of that bookend that commerce used to use this $11 price for nitrogen into Thailand is based on a tiny quantity. It's less than 1% of all the imports into those six countries of nitrogen during that period. So in this case, where we have domestic Thai prices, in Thailand we have other export data calling into question the reliability of the Thai imports of nitrogen generally. And then all of the information the treatment submitted self-corroborating each other, it's not reasonable for commerce to have relied on this single test to determine that the value they used for nitrogen is reliable. One last point with respect to the zero quantity issue in the import data. The government argues that they like to use a whole set of data and they don't want to cherry pick information out of the data. This isn't the argument here today. For the court's understanding, the Commerce Department does this all the time. They use the import data and they exclude imports from non-market economies. They exclude imports from countries that they believe maintain broadly available export subsidies. So this idea that it would be difficult or somehow burdensome to also add in the requirement that if the quantity is zero, we just kick it out, it's not a burden on the agency to do this. And so that's not a real justification when they're already doing pretty significant manipulation to the import data in determining these import values. Thank you. Perfect timing. Thank you. Mr. Brightfield. Thank you, Your Honor. So I would like to use my time to mostly address the standard of review and tempered glass issue. And then I have one small point with respect to nitrogen in response to the court's questions. So on the standard of review covering the tempered glass issue, Ingley is arguing for the first time today that the correct standard is an abuse of discretion standard, but that's incorrect. This court typically reviews CIT decisions de novo, and you have explained the limited circumstances in which you employ an abuse of discretion standard in the Altex case, citing your decision in Taiwan Semiconductors, that you will apply an abuse of discretion standard where the trial court performed no substantial evidence review at all for this court to review. But if you look at the lower court's SWIP opinions, you see a very careful evaluation of the evidence, both in the original remand, SWIP opinion 17-143, and in the second remand, SWIP opinion 18-53. So you see the court saying Commerce didn't explain why its selection was reasonable in light of the Hong Kong data and its value. They found that Commerce's statements were insufficiently explained. The court found that it isn't clear from wood flooring whether Commerce's practice is to assess the percentage of the market that the input data constitutes. So there was real review and analysis by the lower court, and therefore you should apply a de novo standard here, as you've done in the past. And that being said, Commerce clearly was attempting to defend its practice. If you look at Appendix 6502, that is the remand results for the second determination, and if you look on page 17, Commerce clearly states that it is Commerce's practice that countrywide data represents broad market averages and that import statistics represent prices available countrywide from all global trading partners, and thus they are representative of the actual market situation that exists in the surrogate country, and that's why they found that Commerce's selection of Thai import data to value tempered glass is consistent with its preference for that broad market representation. So yes, Commerce reversed its practice under protest, but it clearly defended its practice and would have reached a different result if not for the court's challenges in the two remands. Last point with respect to the nitrogen issue where the United States, one of the judges asked about the challenge of comparing import data with export data. Can I just ask you, is that one of the issues in TRENA's main appeal? Yes. Yes, it is. Okay, I don't think it's appropriate for you to respond to Mr. Freed unless my colleagues disagree. Mr. Freed had his rebuttal time and the other side had a chance. I think it would be a little bit inappropriate for you to get to respond to Mr. Freed when he is not going to be able to get up and respond. Okay, I'm sorry. We had agreed to merge our response and our rebuttal time just for the convenience of the court, but if you'd rather not, I don't have to address that point. Do my colleagues have a view? I agree with the Chief Judge. Yeah, I'm fine either way. Okay. All right, why don't we conclude it there. We thank all parties. This has been a bit confused and we appreciate your cooperation in making this fairly seamless. Thank you all and the case is submitted.